IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 21-cr-30001-DWD |
| | ) | |
| KENDRICK A. FRAZIER, | ) | |
| KENWYN L. FRAZIER, and | ) | |
| JASMINE M. CRAWFORD, | ) | |
| | | |
| Defendants. | | |

<u>MEMORANDUM & ORDER</u>

DUGAN, District Judge:

Defendants Kendrick A. Frazier and Kenwyn L. Frazier have filed a Joint Motion for Judgment of Acquittal or Alternatively a New Trial for which they allege a myriad of errors and bases. (Doc. 369). For the reasons set forth below, the motion is **DENIED**.

I.      BACKGROUND

A.  Superseding Indictment and Bill of Particulars

Kendrick Frazier ("Kendrick") and his brother, Kenwyn Frazier ("Kenwyn") (collectively, "the Fraziers"), were charged in a superseding indictment with one count of kidnapping in violation of 18 U.S.C. § 1201(a)(1) (Doc. 226).[1] The Superseding Indictment and Bill of Particulars (Doc. 224) alleged as follows: On August 13, 2020, Kenwyn was at Lola Eckford's ("Eckford") apartment with Jasmine Crawford

---

[1] The Court's usual practice is to refer to parties by their surnames rather than their first names. However, the defendants in this case (Kendrick Frazier and Kenwyn Frazier) share the same surname. Additionally, the victim (Kein Eastman) and one of the witnesses (Charlene Eastman) share the same surname. To avoid confusion, the Court will refer to these four individuals by their first names rather than by their surnames.

("Crawford") when he woke up from a nap and realized his "grillz" (a jeweled decorative mouthpiece worth thousands of dollars) was missing. Kein Eastman ("Kein"), the father of Eckford's infant son, had been at Eckford's apartment while Kenwyn was sleeping. Kenwyn suspected Kein had stolen the mouthpiece. Kenwyn left Eckford's apartment in a gray Dodge Durango ("the Durango") and located Kein at a home belonging to his grandmother, Charlene Eastman ("Charlene"). Kenwyn took Kein at gunpoint from Charlene's home and transported him to Eckford's apartment, forcing him to look for the grillz.

Eventually, Kenwyn contacted his brother, Kendrick. Kendrick arrived at Eckford's apartment and briefly spoke to Kenwyn. A short time later, the Fraziers dragged Kein out of an upstairs bathroom and through the front door of the apartment yelling, "Take us to our shit." Kenwyn was following behind Kendrick and appeared to be holding a gun. After a physical altercation, Kendrick shot Kein. Kein, who was bleeding from his face, then fled the scene.

Immediately thereafter, the Fraziers left in the Durango, driving in the same direction as Kein. At or about this time, Crawford exited the apartment and covered a Ring video camera that had been recording activity outside of the apartment with a cloth. Approximately two hours later, the Durango was found on fire and burned to the frame. The Durango was not observed returning to the area of Eckford's apartment any time after the shooting. A search of the burned Durango revealed no recoverable physical evidence due to the extensive fire damage.

The Durango was reported stolen by Edward Molton ("Molton"). Molton was a known associate of the Fraziers. Molton rented the Durango from AVIS car rental, and Kenwyn was with Molton when he rented the vehicle. In the time leading up to the Durango being found on fire, cellular phone records revealed multiple phone calls between Kenwyn and Molton, as well as multiple phone calls between Kenwyn and Crawford.

### B. Jury Trial

A jury trial commenced on November 3, 2022, and culminated on November 10, 2022, with a guilty verdict as to both defendants (Docs. 347, 352). The Court will not summarize all the evidence presented over the course of trial – the transcript speaks for itself. Instead, in assessing the instant motion, the Court will evaluate evidence relevant to and only in the detail required to address arguments raised by the Fraziers. Further, when discussing the facts adduced at trial, they will be presented in a light most favorable to the government. *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016)

## II.  APPLICABLE LEGAL STANDARDS

### A.    Federal Kidnapping Statute

The federal kidnapping statute states, in pertinent part, that:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when ... the offender… uses… any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense ... shall be punished by imprisonment for any term of years or for life….

3

18 U.S.C. § 1201(a)(1); see also *United States v. Eason*, 854 F.3d 922, 922 (7th Cir. 2017) (discussing elements).

**B.      Judgment of Acquittal - Rule 29(c)**

A defendant in a criminal case who has been found guilty by a jury may move for a judgment of acquittal under Rule 29(c). FED. R. CRIM. P. 29(c). The Court will only overturn the jury's verdict if "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (citation omitted); s*ee also *United States v. Colonia*, 870 F.2d 1319, 1326 (7th Cir. 1989) (Evidence is sufficient if "*any* rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt, viewing the evidence and every reasonable inference in the light most favoring the prosecution.")(emphasis added); *United States v. Bruun,* 809 F.2d 397, 408 (7th Cir. 1987) (a jury verdict may be overturned only "where the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.")(citations omitted).

The Seventh Circuit has stated that "[a] defendant who challenges the sufficiency of the evidence faces a nearly insurmountable hurdle. . . [in that] [the Court] consider[s] the evidence in the light most favorable to the Government, defer[s] to the credibility determination of the jury, and overturn[s] a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Gougis*, 432 F.3d 735, 743-44 (7th Cir. 2005) (internal quotations omitted).

### C.   New Trial - Rule 33

Federal Rule of Criminal Procedure 33 allows "a district court to grant a timely request for a new trial 'if the interest of justice so requires.' " *United States v. O'Malley*, 833 F.3d 810, 811 (7th Cir. 2016) (quoting Fᴇᴅ. R. Cʀɪᴍ. P. 33(a)). The Seventh Circuit has cautioned that Rule 33 motions should be granted only in "the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (internal quotation marks omitted); *see also United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (explaining that jury verdicts in criminal cases are "not to be overturned lightly").

The Court should only grant a new trial if the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand," *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (alteration in original) (citation omitted), or "if there is a reasonable possibility that [a] trial error had a prejudicial effect on the jury's verdict," *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019). "The ultimate inquiry is whether the defendant was deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713 (7th Cir. 2020) (citation omitted). In making this determination, "[t]he court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable. *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989).

### III.  Dɪsᴄᴜssɪᴏɴ

### A. Motion for Judgment of Acquittal

The Fraziers contend the Government failed to present sufficient evidence to sustain a conviction on kidnapping. Specifically, they argue the Government failed to

prove that (1) Kein was taken or held against his will; (2) Kendrick held Kein for an appreciable time; (3) Kendrick used a cellphone or the Durango to further the alleged kidnapping; and (4) Kendrick was an aider or abettor. Each of these arguments is addressed in turn below.

### 1. Evidence that Kein was Taken or Held Against his Will

To obtain a conviction for kidnapping, the Government had to establish that Kein was held against his will. *See Chatwin v. United States*, 326 U.S. 455, 464 (1946) (noting that "the involuntariness of seizure and detention ... is the very essence of the crime of kidnaping"); *United States v. Hernandez*, 106 F.3d 737, 738 (7th Cir. 1997) (government has the burden of establishing that victim was taken or held against his will); *United States v. Jones,* 808 F.2d 561, 565-67 (7th Cir. 1986) (in federal kidnapping case, absence of consent is an element to be proven).

The Fraziers contend that the Government failed to prove Kein was taken or held against his will because (1) the evidence did not definitively establish that Kenwyn forced Kein from Charlene's home at gunpoint; (2) Kein was not restrained or confined while he was at Eckford's apartment; and (3) he did not flee or call for help, despite having opportunities to do so.

As an initial matter, it was not necessary for Kein to be taken or held at gunpoint, nor was it necessary for him to be physically restrained or confined. As the Supreme Court explained in the case of *Chatwin v. United States,* 326 U.S. 455, 464 (1946),[2] "[t]he act

---

[2] In *Chatwin*, the Supreme Court reversed a kidnapping conviction, reasoning that there was "no proof that [the defendant] or any of the other petitioners willfully intended through force, fear or deception to confine the girl against her desires" because there was no evidence the alleged victim "was deprived of her liberty,

of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or *mental restraint* for an appreciable period against the person's will and with a willful intent so to confine the victim."(emphasis added). Thus, even absent physical restraint, a kidnapping victim can be compelled to comply because he fears harm or injury from the perpetrator. *See United States v. Garza-Robles,* 627 F.3d 161, 167-68 (5th Cir. 2010) ("It was not necessary that [the victim] be physically restrained or confined, as non-physical restraint arising from fear is enough to support a kidnapping conviction…A person's will can be overcome physically or by mental inducements such as threats."); *United States v. Carrion-Caliz,* 944 F.2d 220, 225 (5th Cir. 2001) (discussing cases interpreting the Federal Kidnapping Act, which "clearly hold that non-physical restraint-for instance, fear or deception-can be sufficient to restrain a person against her will," and stating that "physical force or violence" are not required); *United States v. Macklin,* 671 F.2d 60, 64 (2d Cir. 1982) ("The very nature of the crime of kidnapping requires that the kidnapper use some means of force-actual or threatened, physical or mental).

Considering the evidence in its entirety and in the light most favorable to the Government, the record contains more than enough evidence for the jury to conclude that Kein was taken and held against his will. Charlene Eastman and David Collins both testified that Kenwyn arrived at Eastman's home with a gun or what appeared to be a gun, yelling at Kein and demanding that Kein leave with him to "find his shit." Eastman and Collins then observed Kein and Kenwyn enter the Durango and leave the scene.

---

compelled to remain where she did not wish to remain, or compelled to go where she did not wish to go," and "she was perfectly free to leave the petitioners when and if she so desired." *Id.*

Their testimony was partially corroborated by other witnesses who were outside Eastman's home when Kein left with Kenwyn. Although these witnesses did not observe Kenwyn with a gun, they saw Kein leave in the Durango with Kenwyn. They further testified that Kein did not speak to them as he was leaving, though normally he would, and one witness stated that Kein looked scared as he walked by her.

Ring Camera video evidence further corroborated that Kenwyn was carrying a small handgun. When Kenwyn returned to the apartment with Kein, video evidence showed Kenwyn walking behind Kein with a gun in his hand. As Kein walked to the apartment, he repeatedly looked back at Kenwyn, and Kenwyn can be heard saying "look for my shit." Testimony from Lola Eckford and Jasmine Crawford established that, once inside the apartment, Kenwyn ordered Kein to find the grillz. Kein remained in the apartment for the next hour and a half, looking for the grillz. He also told Eckford, on at least one occasion "he's going to kill me over something I didn't do." During this time, Kenwyn exited the apartment several times. However, he was always near the front door and consistently had a gun in his hand or in his pocket.

This evidence was sufficient for the jury to conclude that Kenwyn, who was armed with a gun, took Kein from Eastman's home, drove him to Eckford's apartment, walked him inside the apartment, and held him there for the next hour and a half to find his grillz. The Fraziers correctly argue that the Government did not present evidence showing that Kenwyn held a gun directly to Kein's head or that Kein was physically restrained while at Eckford's apartment. But the law did not impose that evidentiary burden on the Government – "non-physical restraint arising from fear is enough to

support a kidnapping conviction." *United States v. Garza-Robles*, 627 F.3d 161, 167-68 (5th Cir. 2010). *See also United States v. McGrady*, 191 F.2d 829, 830 (7th Cir. 1951) (under the Federal Kidnapping Statute, a "holding or restraint [can] be achieved by mental as well as by physical means."). Moreover, "[t]he inference of a defendant's guilt of a criminal offense may be created either by direct evidence or by circumstantial evidence and circumstantial evidence is of equal probative value to direct evidence." *United States v. Studley*, 892 F.2d 518, 526 (7th Cir. 1989) (internal quotation omitted). In essence, the Fraziers attempted to have the jury believe that a lack of forceful attempt to escape should be equated with absence of restraint. The jury declined to subscribe to that notion. And, here, the evidence presented by the Government was enough for the jury to infer that Kein was sufficiently frightened to accompany Kenwyn to Eckford's home against his will and to remain there against his will.

The Court also notes that the bulk of the Frazier's arguments as to this element of the offense largely depend on credibility determinations and how much weight should be given to the evidence. For example, the Fraziers contend that testimony from Collins and Eastman is not credible because Collins was drinking alcohol on the day in question, Eastman suffers from stroke-related memory issues, and Eastman provided inconsistent statements about Kenwyn having a gun. The Fraziers, however, made these arguments to the jury, and the jury rejected them. It is not the Court's role to "reweigh evidence, assess witness credibility, or assign probabilities to what perspective on the government's case was most persuasive." *United States v. Armbruster*, 48 F.4th 527, 535 (7th Cir. 2022). *See also United States v. King*, 643 F.3d 1003, 1006 (7th Cir. 2011) (determinations of a

witness's credibility are to be made by the jury); *United States v. Colston,* 936 F.2d 312, 315 (7th Cir. 1991) ("Generally, juries may reject parts of a witness's testimony while accepting other parts."). Thus, arguments on these points are unavailing.

Finally, even if the jury found that Kein voluntarily went with Kenwyn to Eckford's house, there was sufficient evidence for the jury to find that Kein was taken and held against his will when the Fraziers knocked down the bathroom door, demanded that he produce the "grillz", dragged Kein outside, and when Kein tried to escape once outside, he was forcibly restrained by his shirt. Kein was then told to lay down just before he was shot him in front of multiple witnesses when he did not produce the grillz.[3] There was also sufficient evidence for the jury to find that, after Kein ran away, the kidnapping continued in the Durango. The Fraziers note that, after the Durango was recovered by the fire department, law enforcement did not locate any physical evidence establishing Kein's presence in the vehicle. But this was not required. Ample circumstantial evidence was presented from which the jury could infer that, when Kein ran away, the Fraziers followed him in the Durango, continuing the kidnapping and then burning the vehicle to destroy evidence.

## 2.  Evidence that Kendrick Aided-and-Abetted the Kidnapping of Kein

The Fraziers contend that the Government failed to present sufficient evidence for the jury to find that Kendrick knew Kein was being held against his will, and as a result,

---

[3] As is set forth more fully below, at this time, the holding of Kein was not merely incidental to his assault. Rather, the evidence, viewed in a light most favorable to the Government, established that he was being held against his will unless and until he returned Kenwyn's grillz.

there was insufficient evidence for the jury to find that Kendrick had the requisite intent to be guilty as an aider-and-abettor. In support of this argument, the Fraziers emphasize that there was no evidence regarding what Kenwyn told Kendrick during the 37-second phone call at 8:13 p.m. and that, given the circumstances when Kendrick arrived at Eckford's home – the neighborhood was active and there were no obvious signs that Kein was being held against his will – Kendrick had no reason to believe that Kein had been kidnapped.

The federal aiding-and-abetting statute consists of two provisions:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

"[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States,* 572 U.S. 65, 71 (2014). *See also United States v. Rivera,* 901 F.3d 896, 901 (7th Cir. 2018) ("Aiding and abetting requires that a person both (1) act in furtherance of the offense (2) with the intent to help the offense's commission."). To be liable for aiding-and-abetting, an individual need not participate in every element of the offense; all that is necessary is the aiding in any act necessary to constitute the offense. *Rosemond,* 572 U.S. at 73. However, the intent requirement of aiding-and-abetting is only met when a person "actively participates in a criminal scheme

11

knowing its extent and character." *See also Id.* at 77. "To aid and abet a crime, a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" *Id.* at 76 (quoting *Nye & Nissen v. United States,* 336 U.S. 613, 619 (1949)).

The Government presented sufficient evidence for the jury to infer that Kendrick knew why Kenwyn summoned him to Eckford's apartment, and that he chose to participate in the criminal scheme knowing Kein was being held against his will. Evidence presented to the jury, viewed in a light most favorable to the Government, established that Kenwyn called Kendrick at 8:13 and spoke to him for 37 seconds. Approximately 20 minutes later, Kendrick arrived at Eckford's home and spoke to Kenwyn outside for approximately five minutes. The Fraziers then entered the apartment and almost immediately knocked down the bathroom door, dragging Kein down the stairs and outside. During this time, Kendrick threatened to shoot Kein if he did not take them to the grillz and yelled "take us to our shit." A jury could reasonably infer from this evidence – particularly the timing of Kendrick's entry into the apartment, his near immediate escalation to violence, and his repeated demands for Kein to "take [them] to [their] shit: - that Kendrick knew he was being summoned to the scene to assist in holding Kein against his will unless and until Kein located Kenwyn's grillz.

Defendants' arguments to the contrary merely establish that there was no direct evidence that Kendrick knew he was arriving at the scene of a kidnapping or offer an alternative way to interpret the evidence, neither of which provides a sufficient basis for overturning the jury's verdict. This includes the contention that, because the

neighborhood was active when Kendrick arrived at Eckford's apartment, he could not possibly have suspected that a crime was occurring. The jury may well have rejected this argument given that the neighborhood was also active, with a party in progress at a neighbor's home, when the Fraziers dragged Kein out of the apartment and shot him in the face, all while he begged and pleaded for his life.

Additionally, as previously discussed, considering evidence presented regarding events that transpired after Kein was shot, a reasonable jury could have concluded that the Fraziers drove after Kein when he ran and placed him in the Dodge Durango, thereby continuing the kidnapping. From this same evidence, the jury could have inferred that, even if Kendrick did not know a kidnapping was in progress when he arrived at Eckford's apartment, that fact soon became apparent, making Kendrick's continued participation in the scheme a sufficient basis for finding him guilty as an aider and abettor.

### 3. Evidence that Kendrick Held Kein for an Appreciable Period

Defendants contend that Kendrick is entitled to a judgment of acquittal because the Government did not offer sufficient evidence to demonstrate that Kendrick held Kein for an appreciable period of time as articulated by the Supreme Court in *Chatwin v. U.S.,* *326 U.S. 455 (1946).* Defendants contend that the brief amount of time Kendrick was present at Eckford's home (approximately 13 minutes between Kendrick's arrival at Eckford's apartment and Kein being shot) is insufficient to establish that Kein was held for an appreciable period because any holding that occurred was incidental to the assault and not a valid basis to find a kidnapping.

Although the federal kidnapping statute does not contain any temporal language, the Supreme Court has found, under the predecessor to 18 U.S.C. § 1201, "[t]he act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint *for an appreciable period* against the person's will and with a willful intent so to confine the victim." *Chatwin v. U.S.*, 326 U.S. 455, 460 (1946) (Emphasis added.).[4] "Remarkably little case law elucidates the standard set down in *Chatwin*…and [n]o case has squarely considered the required duration of an 'appreciable period,' i.e., how long a momentary seizure must continue to become a federal kidnapping." *United States v. Ferguson*, 65 F.4th 806, 811 (6th Cir. 2023).

Several Circuit Courts have concluded brief restraints incidental to other crimes do not constitute a "holding" under the federal kidnapping statute. *See United States v. Jackson*, 24 F.4th 1308, 1314 (9th Cir. 2022) (kidnapping requires "more than a transitory holding, and more than a simple mugging or assault"); *United States v. Howard*, 918 F.2d 1529, 1536 (11th Cir. 1990) (holding element not met where defendants only intended to detain the victim for "the few seconds" it would take to complete the attempted robbery); *Gov't of the Virgin Islands v. Berry,* 604 F.2d 221, 227 (3d Cir. 1979) (restraint that is merely incidental to the commission of another crime does not constitute kidnapping).

---

[4] As the Supreme Court explained in *Chatwin*, the broad language of the federal kidnapping statute must be interpreted in a manner consistent with Congressional intent to avoid the "absurdity" that would result from imposing a "careless concept of the crime of kidnapping." *Chatwin*, 326 U.S. at 464-65. If the holding element is construed too liberally, a "garden-variety, three-minute robbery could be a kidnapping," *id.,* and "the boundaries of potential liability would be lost in infinity." *Id.* at 464.

But unlike the cases discussed above, evidence presented to the jury sufficiently established a kidnapping as a separate crime, regardless of any assault or battery on Kein. First, looking only at the restraint that occurred between 8:32 p.m., when Kendrick arrived at Eckford's apartment, and approximately 8:45 p.m., when Kein was shot and ran away, there was sufficient evidence for the jury to find that Kendrick held Kein against his will as required under the Federal Kidnapping Statute. Although this thirteen-minute period was a relatively brief amount of time when compared to the hours-long restraint initiated by Kenwyn, it was not merely incidental to the commission of a lesser crime. The evidence suggested that Kendrick arrived at Eckford's apartment for the purpose of holding Kein – not just to assault him – but to extract something from him. The Fraziers were yelling at Kein to find the grillz and intended to hold him, involuntarily, unless and until he located Kenwyn's property. When it became clear that Kein could not find (or would not return) the grillz, Kendrick shot him. Thus, even when considering only this 13-minute period, there was sufficient evidence for the jury to find that Kendrick's restraint of Kein was not merely "transitory" or "incidental" to the commission of an assault or battery.

Second, despite the Fraziers' arguments to the contrary, in determining whether the Fraziers kidnapped Kein, the jury was not restricted to considering the events that occurred during this 13-minute period. As discussed above, the Government presented evidence that was sufficient for the jury to infer that the Fraziers continued the kidnapping by driving after Kein and placing him in the Durango, burning the vehicle

15

thereafter to destroy evidence. And that during this time, the Fraziers used the Durango and cellular phones to further the offense.

Finally, as previously addressed, there was sufficient evidence for the jury to find that Kendrick aided-and-abetted Kenwyn in the kidnapping of Kein. Accordingly, even if Kendrick's conduct was insufficient to establish that he acted as a principal in the kidnapping of Kein, the verdict would still stand.

### 4.  Evidence that Kendrick used an Instrumentality of Interstate Commerce

Although earlier versions of the Federal Kidnapping Statute required the asportation of a victim in interstate commerce, Congress amended the act in 2006 to broaden the crime to include intrastate activity when any "means, facility, or instrumentality of interstate…commerce" is used "in committing or in furtherance of the commission of the offense." *See* Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 213, 120 Stat. 587, 616 (codified at § 1201(a)(1)). As is relevant here, the Seventh Circuit has held that cellular phones and vehicles constitute a facility of interstate commerce even when used solely in an intrastate manner. *See United States v. Protho,* 41 F.4th 812 (7th Cir. 2022), *cert. denied,* 143 S. Ct. 465 (2022) (upholding intrastate kidnapping conviction under § 1201(a)(1) where the defendant used a cellular phone in committing the kidnapping); *United States v. Mandel,* 647 F.3d 710, 722 (7th Cir. 2011) (upholding conviction under federal murder-for-hire statute involving defendant's intrastate use of a vehicle in the commission of the offense). The evidence presented during the trial was more than sufficient for the jury to find that Kenwyn called Kendrick using a cell phone to ask for his help in carrying out the kidnapping of Kein. Further, the

16

evidence was sufficient for the jury to conclude that, after Kein was dragged out of the locked bathroom and shot, the Fraziers drove after him in the Durango and continued the kidnapping by placing him in the vehicle, which was later burned to destroy evidence. Although the Government did not present any direct evidence placing Kein in the Durango after he was shot, substantial circumstantial evidence was presented from which the jury could conclude that the Fraziers continued the kidnapping after Kein was shot.

### B. Motion for a New Trial

The Fraziers contend they are entitled to a new trial because: (1) The Court provided the jury with an erroneous supplemental instruction; (2) the Court erred by instructing the jury on aiding-and-abetting liability; (3) the Government constructively amended the indictment and varied from the Bill of Particulars; (4) the Court denied the Fraziers of their right to counsel of choice; (5) the Court erred when it denied Kendrick's motion to dismiss the indictment; and (6) the Government violated *Brady* and *Giglio* by failing to disclose information about a witness. The Court addresses each argument in turn below.

#### 1. Supplemental Jury Instruction

During deliberations, the jury asked: "If he went on own free will and then decided he didn't want to be there, afraid for his safety, but not allowed to leave, is it still considered kidnapping?" (Doc. 350). In response to this question, the Government proposed the following supplemental instruction: "The fact that the victim may have initially voluntarily accompanied the Defendant does not negate the existence of a later

17

kidnapping." (Doc. 348-6, p. 2). Defendants objected to the instruction. Alternatively, if given, Defendants requested the instruction include additional language clarifying that the Government must prove that all of the elements of kidnapping were met after any initial voluntary accompaniment. Ultimately, the Court gave the following supplemental instruction:

> The fact that the victim may have voluntarily accompanied the Defendant does not negate the existence of a later kidnapping, if the Government proves beyond a reasonable doubt all the elements of kidnapping were met subsequent to the voluntary accompaniment.

(Doc. 348-6, p. 1) ("Voluntary Accompaniment Instruction). After receiving the Voluntary Accompaniment Instruction, the jury asked for a definition of the word "subsequent." The Court provided the following response: "The word 'subsequent' as used in the instructions means 'after.'" (Doc. 350, p. 2).

Defendants contend the Court should have declined to answer the jury's question. But the Court had an obligation to "fairly [and] adequately" respond to the jury's inquiry. *United States v. Alexander,* 163 F.3d 426, 429 (7th Cir. 1998). Defendants also contend the Voluntary Accompaniment Instruction violated their due process rights to a fundamentally fair trial because (1) it incorrectly stated the law and (2) the instruction was not related to any theory of the offense that the government presented at trial or in argument.

The federal kidnapping statute does not absolve the abduction of a nonconsenting victim simply because the victim initially accompanied the perpetrator voluntarily. And a majority of courts to have considered the issue have concluded that an initial voluntary

accompaniment does not preclude the possibility that a kidnapping subsequently occurred when the victim withdrew his or her consent. *See e.g., United States v. Eagle Thunder,* 893 F.2d 950, 952–53 (8th Cir. 1990) (even if the victim initially consented to accompany the perpetrator, "that fact would not prevent the occurrence of a kidnapping because [the perpetrator] thereafter detained [the victim] despite her repeated requests to be taken home"); *United States v. Wesson,* 779 F.2d 1443, 1444 (9th Cir. 1986) (per curiam) (upholding conviction under Federal Kidnapping statute where victim may have initially agreed to accompany defendant but where victim later expressed her desire to go home); *United States v. Redmond,* 803 F.2d 438, 439 (9th Cir. 1986) ("The fact that one originally accompanies another without being forced does not prevent the occurrence of a kidnapping where force is later used to seize or confine the victim."). Thus, the Voluntary Accompaniment Instruction accurately relayed that an initial voluntary accompaniment does not "negate the existence of a later kidnapping."

The Fraziers also contend that the instruction was misleading because it allowed the jury to convict even without finding that an instrumentality of interstate commerce was used to further the kidnapping. This argument ignores the second half of the supplemental instruction, which accurately relayed that, in order to convict, the jury must also find that "all the elements of kidnapping were met subsequent to [or after] the voluntary accompaniment.[5] Given that the Court's Voluntary Accompaniment

---

[5] As previously discussed, the Government presented sufficient evidence from which the jury could infer that, after Kein was shot, the kidnapping continued and that the Fraziers used cellular phones and a vehicle to further the continued kidnapping.

Instruction specifically answered the jury's question by providing a correct statement of the law, the Court finds no error. *United States v. Medina*, 430 F.3d 869, 883 (7th Cir. 2005).

Finally, the Fraziers contend that the supplemental instruction warrants a new trial because it denied them the opportunity to address a "new theory" raised by the Government. This is entirely inaccurate. Throughout the case, the Government maintained that the kidnapping began when Kenwyn took Kein from Charlene's home and continued when Kein was dragged outside of Eckford's apartment and shot. The Government also maintained that, from the evidence presented, the jury could infer the Fraziers used the Durango to further the kidnapping after the shooting. The Fraziers opposed this theory, arguing that Kein voluntarily accompanied Kenwyn to Eckford's apartment and voluntarily remained there. They further argued that any "holding" of Kein occurred during the altercation in the bathroom and the front yard, and that there was no evidence the Durango was used to further the alleged kidnapping after the shooting. This is the very argument the Fraziers claim they were denied the opportunity to make, and the Court finds that it does not provide grounds for a new trial.

### 2.  Aiding and Abetting Jury Instruction

The Fraziers contend it was error for the Court to give the jury an aiding-and-abetting instruction because (1) the Government proceeded on the premise that Kendrick was acting as a principal and (2) the evidence was insufficient to support such an instruction. This argument also fails.

The federal aiding-and-abetting statute "does not create a separate offense." *United States v. Galiffa*, 734 F.2d 306, 312 (7th Cir. 1984). "It simply makes those who aided

and abetted a crime punishable as principals." *Id.* Accordingly, "an indictment need not charge [aiding or abetting] separately. Aiding or abetting is a proper basis of conviction in every prosecution." *United States v. Newman*, 755 F.3d 543, 545 (7th Cir. 2014). The Superseding Indictment charged Kendrick with kidnapping, which encompassed an aiding-and-abetting theory of guilt. Thus, an aiding-and-abetting instruction was proper "so long as the evidence warrant[ed] the instruction and no unfair surprise result[ed]" *United States v.* Powell, 652 F.3d 702, 708 (7th Cir. 2011).

In the instant case, as previously discussed, there was more than enough evidence to support an instruction on aiding and abetting. See *Id.* (aiding and abetting instruction warranted so long as "some evidence" indicated that the defendant "associated himself with [the substantive crime], participated voluntarily in it, and tried to make it succeed."). Regarding unfair surprise, given the aiding-and-abetting principles described herein, defense counsel knew, or should have known, that the jury could receive an aiding-and-abetting instruction if warranted by the evidence. Additionally, any claim of unfair surprise is negated by the fact that Kendrick submitted a proposed aiding-and-abetting instruction to the Court before the trial. (Doc. 348-3, p. 12).

Finally, a number of courts have held that an aiding-and-abetting instruction is permissible even where the Government prosecuted the case on the theory that the defendant was liable as a principal. For instance, in *United States v. Cueto,* 628 F.2d 1273, 1275-76 (10th Cir. 1980), the Tenth Circuit Court of Appeals held it was proper to give an aiding-and-abetting instruction when "the government proceeded on the premise that [the defendant] was the principal in the robbery and, after all the evidence was in,

switched theories and proceeded on an aider and abettor basis." *Id.* at 1275. The Appellate Court further explained that "[u]nder the evidence, [the defendant] was either a principal, or an aider and abettor who, in law, is deemed to be a principal…[T]he record amply support[ed] a conviction regardless of whether the jury believed the defendant to be guilty as the principal or as an aider and abettor." *Id. See also United States v. Scroger,* 98 F.3d 1256, 1262 (10th Cir. 1996) (given established aiding-and-abetting law, when more than one person is involved in the criminal act, defendant was not unfairly surprised by an aiding-and-abetting instruction even though it was not charged in the indictment or presented at trial).

### 3. Constructive Amendment or Variance

Defendants contend that the Government constructively amended the indictment and/or varied from the Bill of Particulars by presenting evidence and arguing that the Fraziers held Kein in the Durango after he fled from Eckford's residence. When the government, during its presentation of evidence and/or in its argument, "broadens the possible bases for conviction beyond those presented by the grand jury," the government is said to have "constructively amended" the indictment. *United States v. Rogers*, 44 F.4th 728, 735 (7th Cir. 2022). A constructive amendment violates the Fifth Amendment by abrogating the right to be prosecuted only for crimes charged by a grand jury, exposing the defendant to the risk of double jeopardy, and depriving the defendant reasonable notice that would allow him to defend against his charges. *Id.* (citing *United States v. Trennell*, 290 F.3d 881, 888 (7th Cir. 2002)). Therefore, the indictment may not be

broadened so as to present the trial jury with more or different offenses than what the grand jury charged. *See United States v. Leichtnam*, 948 F.2d 370, 375 (7th Cir. 1991).

A variance exists "when the terms of the indictment are unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Galiffa*, 734 F.2d 306, 312 (7th Cir. 1984). "A variance is fatal only when the defendant is prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him or is exposed to the risk of double jeopardy." *United States v. Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007) (internal quotations omitted). "The line distinguishing variances from constructive amendments essentially is between the situation in which different evidence supports the charged crime (as with a variance) and that in which the evidence supports a crime other than that charged (as with an amendment)." *Id.* (internal quotation marks and citation omitted).

The grand jury charged the Fraziers with one count of kidnapping Kein on or about August 13, 2020. As detailed in the Bill of Particulars (Doc. 224), evidence presented to the grand jury included the same evidence and argument to which the Fraziers now object. In particular, that (1) the Ring video showed Kendrick shooting Kein in front of Eckford's apartment; (2) immediately after the shooting, Kein, who was bleeding from his face, fled the scene; (3) Kendrick and Kein entered the Durango and went in the same direction as Kein; and (4) approximately two hours after the shooting, the Durango was found burned to the frame, destroying any possible evidence. Thus, negating the claim that there was a fatal variance.

The Fraziers have also failed to establish a constructive amendment. The Superseding Indictment "alleges only one offense that may be proved by varied fact patterns," and as a result, "the presentation during closing argument of several factual scenarios to establish guilt does not constructively amend the indictment." *United States v. Folks*, 236 F.3d 384, 392 (7th Cir. 2001).

### 4. Choice of Counsel

Initially, CJA panel attorney John Stobbs was appointed to represent Kendrick, and CJA panel attorney Greg Smith was appointed to represent Kenwyn. On March 8, 2021, Attorney Beau Brindley moved to jointly represent both Defendants. (Docs. 98, 99). On March 9, 2021, the Court held a status conference with all counsel and directed Attorney Brindley to file written waivers signed by each defendant as well as a memorandum addressing the existence of any actual or potential conflicts of interest by noon on March 16, 2021 (Docs. 102, 103). The Court also appointed separate counsel to advise the Fraziers on the nature and potential of any conflicts of interest and on the impact that any such conflicts might have on the outcome of their case (Doc. 113). After holding a hearing on the matter, the Court denied the motions to substitute (Docs. 121, 129). After additional briefing and motion practice, Attorney Brindley was allowed to proceed with the representation of Kenwyn, and Attorney Vadim Glozman, an attorney that shares office space with Attorney Brindley, was allowed to proceed with the representation of Kendrick. The Fraziers now argue that they are entitled to a new trial because Kendrick was denied the counsel of his choice for the entire proceeding, and

because Kenwyn    was denied the counsel of his choice at a critical stage in the proceeding.

Kendrick's argument is not new and does not present a basis for a new trial. The Court has addressed the question the appropriateness of permitting dual representation in this case before and found permitting Attorney Brindley to represent both would be fraught with almost certain conflict in the absence of any meaningful waiver. (Doc. 129, pp. 4-7 and Doc. 145). As noted above, on April 14, 2021, the Court held a hearing on the motions to substitute counsel. In direct violation of the undersigned's order, Attorney Brindley did not file written waivers regarding conflicts of interest prior to the hearing on the motions to substitute counsel. This directive was not a mere exercise or hurdle to be negotiated, but an attempt to further ensure that Mr. Brindley had provided each of the Fraziers the opportunity to get answers to their questions about the consequences of dual representation in light of his planned strategies and defenses, something the Court could not effectively accomplish with a colloquy. While not determinative, his failure to secure written waivers as ordered detracted from Mr. Brindley's argument that their waiver, such as it was, was "knowingly and intelligently" made. *Wheat v. United States*, 486 U.S. 153, 163, 108 S. Ct. 1692, 1699, 100 L. Ed. 2d 140 (1988) ("Nor is it amiss to observe that the willingness of an attorney to obtain such waivers from his clients may bear an inverse relation to the care with which he conveys all the necessary information to them.")

Nevertheless, during the hearing, the Court along with counsel for defendants and for the United States examined the Fraziers to determine whether their oral waivers of any conflicts were knowing and intelligent.[6] Although the Fraziers offered answers indicating that they both wanted Mr. Brindley as their attorney, their responses were perfunctory and rote. Neither defendant could explain in his own words, even on a basic level, what they were giving up by waiving their rights to conflict-free counsel or what risks were involved in such a decision. As such, the Court could not find that their waivers were knowing and voluntary. *See United States v. Algee*, 309 F.3d 1011, 1014 (7th Cir. 2002) cert. den., *Algee v. United States*, 538 U.S. 925 (2003) ("[B]ecause of the dangers associated with multiple representation, a district court must be allowed 'substantial latitude' in refusing waivers of conflicts of interest.) *(quoting Wheat v. United States,* 486 U.S. 153, 163 (1988)); *Wheat,* 486 U.S. at 161-63. (waivers of the conflict may not be valid if the attorney has not conveyed to the clients all necessary information to make their waivers knowing and intelligent).

Moreover, the presumption in favor of a defendant's choice of counsel "may be overridden if there is an actual conflict of interest or a serious potential for conflict." *United States v. Turner*, 594 F.3d 946, 948 (7th Cir. 2010).  If a court "finds an actual conflict of interest that seriously undermines counsel's effectiveness, 'there can be no doubt that

---

[6] The Fraziers claim that the Court's colloquy was inadequate notwithstanding this Court's determination that conflict of interest was likely to arise. The Supreme Court has stated that "a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Wheat,* 486 U.S. at 160; *see also* Fed. R. Crim. P. 44(c)(stating that in cases of joint representation, "[u]nless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel").

[the court] may decline a proffer of waiver, and insist that the defendants be separately

represented.' " *Id.* at **952**, quoting *Wheat,* 486 U.S. at 162. But, as explained by the Seventh

Circuit in *Turner*:

> The disqualification decision becomes more difficult, however, if the joint representation presents only    a *potential* for    conflict. Because a possible conflict inheres in almost every instance of multiple representation, the Supreme Court has said that only a *serious* potential conflict will justify overriding the defendant's choice of counsel. This requires an inquiry into the likelihood that the potential conflict will mature into an actual conflict and the degree to which it threatens the right to effective assistance of counsel. Accordingly, before disqualifying counsel based on a *potential* conflict, the district court should evaluate (1) the likelihood that the conflict will actually occur; (2) the severity of the threat to counsel's effectiveness; and (3) whether there are alternative measures available other than disqualification that would protect the defendant's right to effective counsel while respecting his choice of counsel. The first inquiry is the most important; a conflict that would seriously undermine counsel's effectiveness is not a basis for disqualification if it has little likelihood of occurring.

*Turner,* 594 F.3d at 952 (internal quotations and citations omitted).

Looking at this case as it existed before trial, the existence of a *serious* potential

conflict that was likely to mature into an actual conflict, and which would have

"intolerably undermin[ed]" the Fraziers' right to effective assistance of counsel, is

obvious.  The Fraziers were facing a minimum sentence of life imprisonment if they went

to trial and were found guilty of kidnapping. The Government had indicated that (1) the

investigation was ongoing; (2) there was a potential for the filing of death-eligible

homicide charges; and (3) cooperation was not off the table. Considering these factors, as

well as the Fraziers' apparent unequal culpability, there was a serious potential for

conflict in the likely event that evidence or testimony prejudicial to one client but

favorable to another would come to light. In such a scenario, ethical constraints would prevent counsel from vigorously challenging the evidence or cross examining the witness. Further, given that the Fraziers were facing a life sentence, with the possibility of a death-eligible homicide charge, the likelihood that Kendrick would change his mind and seek cooperation or "point the finger" at Kenwyn (or vice versa) was greatly increased.[7] Finally, if the Court had allowed the joint representation and a conflict had arisen during trial, at that point, the only recourse would be a mistrial. Attorney Brindley would be unable to continue representing one or both of his clients. How would he determine the source of any damaging information he may have obtained as to either client? How would he sort what information must be forgotten, set aside, and never used during the trial?

True, the Seventh Circuit has said that the "mere possibility" that jointly represented defendants "would decide to cooperate with the government against the other" is not enough to disqualify a defendant's counsel of choice." *United States v. Turner, 594 F.3d 946 (7th Cir.2010)*, But the circumstances of this case presented much more than a "mere possibility" that Kendrick or Kenwyn might choose to cooperate.[8] Here, there

---

[7] The Court's evaluation was not wrong. By way of example, during closing arguments, Attorney Brindley argued as follows regarding which defendant dragged Kein down the stairs: "Who drug him down the stairs? There was a disagreement. Jasmin said Kendrick did. Lola said Kenwyn did. Mr. Glozman will say it's probably Kenwyn. I'll say probably Kendrick. That's what's going to happen…" Trial Transcript, November 9, 2022, p. 31.

[8] In *United States v. Turner*, the trial court entered the disqualification order "without making any personal inquiry of [the defendant]." 594 F.3d at 954. "This inhibited the court's ability to fully assess the risk that a conflict would actually arise and evaluate whether other protective measures short of disqualification were available." In the instant case, during the hearing, the undersigned spoke with the Fraziers regarding the proposed joint representation. As outlined in the Court's initial order disqualifying Attorney Brindley and his firm from jointly representing the Fraziers, the Court observed the following:

were multiple ways in which a conflict might emerge, all of the potential conflicts were serious, and the likelihood of one or more conflicts arising during trial was great.

In summary, as to this issue, the Fraziers are not entitled to a new trial because (1) there was never a knowing and voluntary waiver of the right to conflict-free counsel as to Attorney Brindley and his firm proceeding with a joint representation and/or (2) given the high likelihood of multiple serious conflicts emerging during the proposed joint representation, the Court correctly used its discretion and declined to allow the joint representation.

### 5. Unbiased Grand Jury

Kendrick also contends that he is entitled to a new trial because the Government deprived him of his right to be tried by an indictment returned by an independent and unbiased grand jury. In the current motion, Kendrick does not present any new arguments addressing why the court's ruling was erroneous. Instead, he simply relies on his earlier-filed briefs (Docs. 279, 282) and contends that "[f]or the reasons stated in his motions," the Court should vacate the judgment and order a new trial.

---

While Defendants offered answers indicating that they wanted to pursue joint representation, the Court's observation was that the responses were perfunctory and rote. Neither defendant could explain in his own words, even on a basic level, what they were giving up by waiving their rights to conflict-free counsel or what risks were involved in such a decision. While each Defendant expressed a willingness to go forward with joint representation, Defendants' body language, hesitations, tones, and demeanors in the courtroom strongly suggested that their waivers were not knowing or intelligent.

(Doc. 129, pp. 4-5). Thus, unlike *Turner*, the Court had the ability to "fully assess" the likelihood that a conflict would emerge and, relying on "instinct and judgment based on experience," was able to make a decision that appropriately applied applicable authority. *Wheat v. United States*, 486 U.S. 153, 163 (1988); *Weaver v. Nicholson*, 892 F.3d 878, 883 (7th Cir. 2018).

In his earlier filed motion, Kendrick argued that the Government presented irrelevant and inflammatory testimony to the grand jury, depriving the grand jury of its independence and rendering it biased. Specifically, Kendrick objected to testimony regarding (1) Kendrick and Kenwyn's gang affiliation; (2) Individual A being afraid of Kendrick and Kenwyn; (3) Kendrick and Kenwyn's involvement in other criminal activity; and (4) statements made by the prosecutor. Kendrick also objected to the government's failure to present complete evidence as to Individual A's involvement in illegal activity and questioned whether law enforcement testimony suggested that video clips shown to the grand jury were altered. The Court spent a considerable amount of time and judicial resources ruling on this motion (Doc. 283). Because Kendrick adds nothing new to his previous arguments, he gives the Court no reason to reconsider its ruling. Stated differently, Kendrick's "arguments" (which amount to nothing more than a reference to the previously filed briefing), do not meet the burden placed on defendants to provide adequate grounds for relief under Rule 33.

### 6.  Alleged Violation Under *Brady/Giglio*

The Fraziers also contend that they are entitled to a new trial because the prosecution committed a *Brady* and/or *Giglio* violation by intentionally suppressing evidence pertaining to Charlene suffering from a stroke that impacted her memory several weeks after the kidnapping. Charlene was interviewed by East St. Louis police on August 14, 2020 (the day after Kein was taken from her home). Charlene's trial testimony was largely consistent with what she reported to police on August 14, 2020, including her claim that Kenwyn was carrying a gun when he took Kein from her home. Charlene was

reinterviewed by the Illinois State Police on September 3, 2020, but provided inconsistent statements, including inconsistent statements regarding whether she saw Kenwyn holding a gun. At trial, when questioned about the inconsistencies, Charlene indicated that she suffered from a stroke a couple of weeks after the kidnapping but before her interview with the Illinois State Police. Charlene stated that initially the stroke impacted her memory, but that her memory had improved over time, and that she was confident the testimony she gave regarding the night Kein was kidnapped was accurate. Although information regarding Charlene's stroke and related memory issues were first disclosed at trial, Defense counsel had an opportunity to question Charlene regarding the same.

In *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process of law where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution." The Supreme Court further held in *Giglio v. United States,* 405 U.S. 150, 153 (1972), that any material evidence which might undermine the reliability of a government witness must be turned over to a defendant. The prosecution's failure to disclose *Brady* or *Giglio* information does not automatically require a new trial. *United States v. Bagley,* 473 U.S. 667, 674 (1985). A new trial is only required "if the evidence at issue is (1) favorable, (2) suppressed and (3) material to the defense." *United States v. Jumah,* 599 F.3d 799, 808 (7th Cir. 2010); *see also* *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008).

Here, the Government's failure to disclose Charlene's stroke does not warrant a new trial. First, although the information was discovered by the Fraziers during trial, they

had sufficient time to utilize the newly disclosed information. And there is no indication that the information was "suppressed" as required for a *Brady* violation. *See United States v. Reyes,* 270 F.3d 1158, 1166-67 (7th Cir. 2001) (nothing in *Brady* requires that disclosures be made before trial; due process is satisfied so long as a delayed disclosure is made "before it is too late for the defendant to make use of any benefits of the evidence."). Second, the evidence regarding Charlene's stroke and its impact on her memory was not "material." "[E]vidence   is material  for *Brady* purposes only if there is a reasonable probability that its disclosure to the defense would have changed the result of the trial. *United States v. Morales*, 746 F.3d 310, 315 (7th Cir. 2014) (internal quotation and citations omitted). In the instant case, an overwhelming amount of evidence was presented establishing that Kenwyn had a gun when he arrived at Charlene's home and that he forced Kein to accompany him to Eckford's home against his will. Considering all of the evidence presented at trial, the Fraziers simply cannot establish that the information regarding Charlene's stroke would have changed the result of the trial.

## IV.    Conclusion

For the reasons stated herein, the Joint Motion for Judgment of Acquittal or Alternatively a New Trial (Doc. 369) filed by Kendrick Frazier and Kenwyn Frazier is **DENIED** in its entirety.

**SO ORDERED.**

Dated: July 12, 2023

DAVID W. DUGAN
United States District Judge